**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

FELIX NKANSAH,

        Plaintiff,

        -against-                  18 Civ. 10230 (PAE) (SLC)

UNITED STATES OF AMERICA;
JOHN DOES #1-36 (United States Immigration and
Customs Enforcement Agents, Individually and in their      NOTICE OF MOTION
Official Capacity),

        Defendants.
_____x

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, the Rule 56.1 Statement of Undisputed Facts, the annexed Exhibits A through Q, and upon all prior pleadings and proceedings had herein, Plaintiff FELIX NKANSAH, by his attorney Rehan Nazrali, Esq., will move this Court, before the Honorable Kimba M. Wood, United States District Judge, at the United States Courthouse located at 500 Pearl St # 1610, New York, NY 10007, at a date and time to be designated by the Court, for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure:

1. Granting summary judgment in favor of Plaintiff on his claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), including: Assault and Battery, Negligence, Negligent Guarding, Gross Negligence (including negligent hiring, training, supervision, and retention), Negligent Infliction of Emotional Distress

2. Awarding Plaintiff compensatory damages for physical and emotional harm, including medical expenses and ongoing treatment as set forth in Exhibits D through F;

3. And granting such other and further relief as the Court may deem just and proper.


PLEASE TAKE FURTHER NOTICE that, pursuant to the Court's rules and the Local Civil Rules of the Southern District of New York, opposing papers, if any, must be served within the time provided by Rule 6 of the Federal Rules of Civil Procedure and the Court's individual practices.

Dated: New York, New York
 July 18, 2025

                            Respectfully submitted,
                          __ /s/ Rehan Nazrali____
                          REHAN NAZRALI, ESQ.
                          Attorney for Plaintiff
                          277 Broadway, 17th Floor
                      New York, NY 10007

Tel: (646) 331-9378
Email: rnazraliesq@gmail.com

To:

**AUSA Carly Weinreb**
United States Department of Justice
86 Chambers Street
New York, NY 10007
Attorney for Defendants

UNITED STATES DISTRICT COURT  SOUTHERN DISTRICT OF NEW YORK

————————————————————————————x

FELIX NKANSAH,

              Plaintiff,

           -against-                        18 Civ. 10230 (PAE) (SLC)

UNITED STATES OF AMERICA;
JOHN DOES #1-36 (United States Immigration and
Customs Enforcement Agents, Individually and in their
Official Capacity),

              Defendants.

————————————————————————————x


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT

## OF THEIR MOTION FOR SUMMARY JUDGMENT AND DISMISSAL


**REHAN NAZRALI**
REHAN NAZRALI Esq. For Plaintiff
277 Broadway,  New York, New York 10007
Tel: (646) 331-9378

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................iv

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

STANDARD OF REVIEW................................................................................................ 2

ARGUMENT

      **POINT I**
            DEFENDANT'S USE OF FORCE
            TO RE-RESTRAIN PLAINTIFF
            LACKED PRIVILEGE AND WAS
            AN ASSAULT AND BATTERY UNDER
            THE FTCA ...................................................................................3

      **POINT II**
            PLAINTIFF's MOTION FOR SUMMARY
            JUDGMENT FOR HIS NEGLIGENT GUARD
            CLAIMS  AGAINST ICE UNDER FTCA §1346(b)
            MUST BE GRANTED AS IT IS UNDISPUTED THAT
             ICE OFFICERS FAILED TO GUARD PLAINTIFF AGAINST
            UNREASONABLE INJURY ......................................................... 7

      **POINT III**
            PLAINTIFF's NEGLIGENCE CLAIMS
            AGAINST ICE MUST BE GRANTED AS IT
            IS UNDISPUTED THAT ICE OFFICERS
            WERE NEGLIGENT IN THEIR DUTY TO
            PREVENT INJURY TO PLAINTIFF.............................................10

      **POINT IV**
            PLAINTIFF's GROSS NEGLIGENCE
            CLAIMS AGAINST ICE MUST BE GRANTED
            AS IT IS UNDISPUTED THAT ICE  WERE NEGLIGENT
            IN THEIR HIRING, TRAINING AND RETENTION OF
            THESE OFFICERS  WHO FAILED  TO PREVENT INJURY TO
            PLAINTIFF………………………………....................................13

**POINT V**

      PLAINTIFF's NEGLIGENT INFLICTION OF
EMOTIONAL OF DISTRESS CLAIM
AGAINST ICE MUST BE GRANTED AS IT IS
 UNDISPUTED THAT ICE WAS NEGLIGENT
IN THE MANNER OF RE-RESTRAINING PLAINTIFF
AND THAT PLAINTIFF HAS SUFFERED EMOTIONAL
DISTRESS AS A RESULT OF THEIR
NEGLIGENCE .........................................................................17

**POINT VI**

      DEFENDANTS' TESTIMONY AND
DOCUMENTARY EVIDENCE FAIL
TO PROVIDE ANY EVIDENCE TO
REBUT PLAINTIFF'S CLAIMS ............................................. 20

**POINT VII**

      PLAINTIFF SUFFERED DAMAGES DUE
TO DEFENDANT'S NEGLIGENCE BECAUSE
UNDISPUTED MEDICAL EVIDENCE ESTABLISHES
PLAINTIFF'S PTSD DIAGNOSIS, ONGOING DISABILITY, AND
CAUSAL CONNECTION TO
INCARCERATION ................................................................. 23

# TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Alfrey v. United States</u>, 276 F.3d 557, 567 (9th Cir. 2002)..................................................8

<u>Allen v. Murray – Lazarus</u>, 463 F. App'x 14, 16 (2d Cir. 2012)..........................................3

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)........2

<u>Benjamin v. Fraser</u>, 264 F.3d 175, 188, 190 (2nd. Cir. 2001)..........................................17

<u>Berkovitz v. United States</u>, 486 U.S. 531 (1988)............................................ 7, 8, 15

<u>Brown v. New York</u>, 202 A.D.3d 1078 (2d Dep't 2022)..........................................17

<u>Castro v. Cnty. of Nassau</u>, 739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010)..................................2

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)..........3, 20

<u>Colnaghi, U.S.A. v. Jewelers Prot. Servs.</u>, 81 N.Y.2d 821 (1993)..................................10, 13

<u>Colon v. State of N.Y.</u>, 209 A.D.2d 842 [3d Dep't 1994]..........................................11

<u>Coulthurst v. United States</u>, 214 F.3d 106, 108 (2d. Cir. 2000)..................................8, 14, 15

<u>Delgado v. City of New York</u>, 928 N.Y.S.2d 487, 509-10 (2011)  ................................. 3

<u>D.T. v. Sports & Arts in chs. Found., Inc.</u>, 193 A.D.3d 1096, 1096 (2021)......................................15

<u>Ehrens v. Lutheran Church</u>, 385 F.3d 232 (2d Cir. 2004)..........................................13

<u>F.D.I.C. v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010)......................................20

Farmer v. Brennan, 511 U.S. 825 (1994).........................................................................24

Ferrara v. Galluchio, 152 N.E.2d, 249, 252 (N.Y. 1958)................................................23

Fiedler v. Incandela, 222 F. Supp. 3d 141.......................................................................16

Golden First Mortg. Corp. v. Berger, 251 F. Supp. 2d 1132,..........................................10

Graham v. Connor, 490 U.S. 386, 396 (1989)..................................................................11

Hayut v. State Univ. of N.Y., 352 F.3d 733, 743–44 (2d Cir. 2003)..................................22

Howell v. New York Post Co., Inc. 612 N.E.2d 699, 702  (1993)......................................19

Suk Chang v. United States, 139 F.4th 1087, (2025)..........................................................7

Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)....................................3

Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).........................20, 21, 22

Jones v. Treubig, 963 F.3d 215, 219 (2d. Cir. 2020) ……..................................................5

Kagan v. State of N.Y., 221 A.D.2d 7 (2d Dep't 1996).....................................................10

Kavazanjian v. Rice, 2005 WL 1377946, at *5 (N.D.N.Y. June 6, 2005).........................21

Kerman v. City of New York, 374 F.3d 93........................................................................12

Lewis v. State of N.Y., 223 A.D.2d 800 [3d Dep't 1996])..................................................11

Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012)....................................................4

<u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 310 (2d Cir. 2008)....................21

<u>Maxwell v. City of New York</u>, 380 F.3d 106, 108 (2d. Cir. 2004).......................................................5

<u>Mendez v. City of N.Y.</u>, 137 A.D.3d 468 (1st Dep't 2016)...............................................................12

<u>Merzon v. Cty. of Suffolk</u>, 767 F. Supp. 432, 448 (E.D.N.Y. 1991)...................................................4

<u>Millbrook v. United States</u>, 569 U.S. 50, 133 S. Ct. 1441 (2013)...................................................4, 5

<u>Molchatsky v. U.S.</u>, 778 F.Supp.2d 421, 437 (S.D.N.Y. 2011)..........................................................14

<u>Ornstein v. New York City Health & Hosps. Corp.</u>, 10 N.Y.3d 1, 6 (N.Y. 2008)..............................23

<u>Patterson v. County of Oneida</u>, 375 F.3d 206, 219 (2d Cir. 2004.....................................................20

<u>People v. Goetz</u>, 68 N.Y.2d 96, 109 (2d. Cir. 1986)..........................................................................4

<u>Powell v. Nat'l Bd. Of Med. Examiners</u>, 364 F. 3d 79, 84 (2d Cir. 2004)..........................................3

<u>Prado v. Perez</u>, 451 F. Supp. 3d 306, 313-14 (S.D.N.Y. 2020)........................................................17

<u>Richards v. United States</u>, 369 U.S. 1 (1962)..................................................................................13

<u>Rivera v. Puerto Rican Home Attendants Servs.</u>, 930 F. Supp. 124, 133.......................................4, 5

<u>Robinson v. Concentra Health Services</u>, 781 F.3d 42, 44 (2d. Cir. 2015)..........................................20

<u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 104 (2d Cir. 2011...............................2

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)........................................................................................22

Sheppard-Mobley v. King, 10 A.D.3d 70, 74 (2d Dep't 2004)........................................ 17

Sheridan v. United States, 487 U.S. 392 (1988)...........................................................14

Sullivan v. Gagnier, 225 F.3d 161 (2d Cir. 2000)..........................................................6

Taggart v. Costabile, 131 A.D.3d 243, 256 (2d Dep't 2015............................................17

Tardif v. City of N.Y., 991 F.3d 394 (2d Cir. 2021)....................................................4, 5

Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475-76  (2d Cir. 2006)......................7, , 9, 10, 19

United National Insurance Co. v. Waterfront New York Realty Corp., 994  F.2d 105, 108 (2d Cir.
1993)  ………………………………………………………………………………...…….4

**Statutes**

28 U.S.C. § 2680(a)......................................................................................7

28 U.S.C. § 1346(b)(1)..............................................................3, 7, 11, 15, 17, 18

28 U.S.C. § 2680(h) ...............................................................................3, 4, 5

Federal Rule of Civil  Procedure 56 ………………………………………………….1

Fed. R. Civ. P. 56(a).....................................................................................20

Fed. R. Civ. P. 56(c)(1)(B) ...........................................................................2

Fed. R. Civ. P. 56(e)....................................................................................20

## PRELIMINARY STATEMENT

Plaintiff Felix Nkansah respectfully submits this memorandum of law in support of his motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. On August 17, 2015, Plaintiff Felix Nkansah (Plaintiff) was assaulted and battered by ICE agents while detained at the Varick Street Detention Center. Plaintiff now seeks summary judgment on his claims for **Assault and Battery**, **Negligence, Negligent Guard, Negligent infliction of emotional distress and Negligent Training, Gross Negligence and Negligent Supervision and Retention** based on the uncontroverted material facts presented herein, i.e. deposition testimony, video recordings of the incident and ICE documents that unequivocally demonstrated that ICE officers, under the command of Defendant's employee ICE Officer Thomas Weidlein, assaulted and battered him when they failed to issue verbal commands required by ICE protocol to restrain Plaintiff who was not previously known and or shown to have refused and or resisted compliance with verbal commands, and thereupon Defendants used unprivileged, excessive and unjustified physical force to effectuate compliance of Plaintiff, who was not resisting, without lawful justification and in violation of clearly established governmental protocols and Second Circuit precedent. Plaintiff has no history of violence and or resisting lawful orders and there is no chronologically inconsistent evidence that Defendants can produce that contradicts Plaintiffs account of the claim of impermissible, unprivileged first contact between himself and ICE from the point ICE Officers enter Plaintiff's cell where he is unrestrained to the instance where ICE first makes physical contact with the Plaintiff.

As such Plaintiff presents unrebutted evidence demonstrating that the Defendants violated the FTCA when while re-restraining Plaintiff used unprivileged force to effectuate compliance and thus assaulted and battered Plaintiff thereof. For the reasons set forth below, Plaintiff's claim for Assault and Battery, Negligence, Negligent Guard, Negligent infliction of emotional

distress and Negligent Training, Gross Negligence; Supervision and Retention should be granted pursuant to Federal Rule of Civil Procedure 56.

## STATEMENT OF FACTS

For a complete statement of the relevant and undisputed facts, the Court is respectfully referred to Plaintiff's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, dated 07/18/2025 ("Def. 56.1 Stmt.").

## STANDARD OF REVIEW

Plaintiff is entitled to summary judgment as it shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

The movant carries the burden of demonstrating the absence of a material fact issue. Rojas, 660 F.3d at 104. The court must construe the facts in the light most favorable to the nonmoving party and resolve all reasonable inferences and ambiguities against the moving party. Anderson, 477 U.S. at 249-50. A moving party may indicate the absence of a factual dispute by, inter alia, "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has met its burden, "the nonmoving party may not rest upon mere conclusory allegations or denials." The allegations in the complaint are deemed to be true for purposes of this motion only. Castro v. Cnty. of Nassau, 739 F. Supp. 2d

153, 165 (E.D.N.Y. 2010) (internal citations and quotation marks omitted). Rather, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." Allen v. Murray – Lazarus, 463 F. App'x 14, 16 (2d Cir. 2012). Furthermore, "the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion." Powell v. Nat'l Bd. Of Med. Examiners, 364 F. 3d 79, 84 (2d Cir. 2004). Here, because there are clearly no genuine issues of material fact, summary judgment should be granted in favor of Plaintiff.

## ARGUMENT

### POINT I

### DEFENDANT'S USE OF FORCE TO RE-RESTRAIN PLAINTIFF LACKED PRIVILEGE AND WAS AN ASSAULT AND BATTERY UNDER THE FTCA SUFFICIENT TO GRANT SUMMARY JUDGMENT.

Courts have routinely found that when government agents exceeded the scope of lawful authority or used excessive force, the government was not protected by privilege or discretionary function exceptions under the FTCA. Delgado v. City of New York, 928 N.Y.S.2d 487, 509-10 (2011). Under 28 U.S.C. § 1346(b)(1), the FTCA waives sovereign immunity for certain torts committed by federal employees acting within the scope of employment under state law. The United States waives its sovereign immunity for tortious acts committed by federal employees acting within the scope of their employment, to the extent a private person would be liable under the law of the state where the conduct occurred. 28 U.S.C. § 1346(b)(1). Accordingly, under 28 U.S.C. § 2680(h), assault and battery are actionable under the FTCA if committed by law

enforcement officers. Notably, Congress expressly included certain intentional torts, including assault and battery by law enforcement officers, in its waiver. 28 U.S.C. § 2680(h); Millbrook v. United States, 569 U.S. 50, 54-57 (2013). The Supreme Court has clarified that the FTCA's waiver for assault and battery by law enforcement extends to all acts within the scope of employment, not only arrests and searches. Id. at 50. Thus, where excessive force is used by federal law enforcement, even if it is outside of an initial apprehension, then the claim is actionable under the FTCA. Id.

Additionally, under the FTCA, whether a government agent's use of force constitutes assault and battery is determined by state tort law. Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012). An assault is an intentional placing of another person in fear of imminent harmful or offensive contact. United National Insurance Co. v. Waterfront New York Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993). The intent requisite to an assault under New York law is the intent either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact. Rivera v. Puerto Rican Home Attendants Servs., 930 F. Supp. 124, 133 (1996). A battery is an intentional wrongful physical contact with another person without consent. United National Insurance Co., 994 F.2d at 108. To prove battery, the required intent is merely that the defendant intentionally made bodily contact and that the intended contact was itself offensive or without consent. Rivera, 930 F. Supp. at 133. Once a plaintiff has made out a prima facie case of an assault and battery, there is a presumption from such proof that there was no justification of such contact. Merzon v. Cty. of Suffolk, 767 F. Supp. 432, 448 (E.D.N.Y. 1991). The presumption is rebuttable, however, and if the defendant presents proof of justification, the ultimate burden of proving the absence of justification rests with the plaintiff. Id. For a defendant to prevail on a justification defense in New York, there must be at least a reasonable doubt as to whether the defendant reasonably believed himself to be in danger. People v. Goetz, 68 N.Y.2d 96, 109 (2d. Cir. 1986). New York law permits law enforcement to use only such force as is reasonable and necessary to carry out lawful duties, where any excessive or gratuitous force is unprivileged and constitutes a battery. Tardif v. City of New York, 991 F.3d

394, 408 (2d. Cir. 2021).  In New York, a correction officers' attack on an inmate consisting of mocking his medically issued protective helmet and removing it and assaulting him, was held to be a beating not in furtherance of the employers' interest and deemed a "malicious attack completely divorced from the employer's interest." Rivera v. State of New York, 34 N.Y.3d 383, 391 (N.Y. 2019). Accordingly, in New York under Correction Law § 137(5), law enforcement may only use force reasonably required and prohibits correctional staff from subjecting incarcerated individuals to degrading treatment and from physically assaulting them unless in self-defense, to prevent a revolt, or to re-enforce order. New York courts have held that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others violates the Fourth Amendment. Jones v. Treubig, 963 F.3d 215, 219 (2d. Cir. 2020). Where an individual is already compliant or restrained, further application of force is neither necessary nor justified under state law. Id.

Under the FTCA and under New York law, for a Plaintiff to establish liability for assault and battery, a plaintiff must show that law enforcement personnel made intentional contact with the Plaintiff or placed him in fear of contact and that the officer's use of force was not reasonable under N.Y. Penal Law § 35.30. Critically, an officer may use force only to the extent objectively reasonable, even outside an arrest context. Forcibly re-restraining a detainee without justification is actionable. Tardif v. City of N.Y., 991 F.3d at 416-18. Pursuant to the FTCA, the Supreme Court confirms that federal law enforcement officers can be sued for intentional torts, like assault and battery, that are committed within the scope of employment under the FTCA's § 2680(h) exception to sovereign immunity. Millbrook v. United States, 569 U.S. 50, 133 S. Ct. 1441 (2013). In New York, force is privileged only if it is reasonable and necessary. In the law enforcement context, the plaintiff must also demonstrate that the officer's conduct was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. Maxwell v. City of New York, 380 F.3d 106, 108 (2d. Cir. 2004). The Second Circuit has held that even when a subject is resisting arrest, an officer's use of force must be objectively and reasonably

related to the resistance offered, and does not give an officer the license to use force without limit; essentially the force must be reasonably related to the nature of the resistance and force used, threatened, or reasonably perceived to be threatened. Sullivan v. Gagnier, 225 F.3d 161, 166 (2nd. Cir. 2000).

Here, Defendants' excessive and unreasonable use of force occurred after Plaintiff was first approached unrestrained, isolated, inert and utterly compliant prior to any alleged verbal commands to comply with re-restrainment under ICE protocols. (See Exhibit A at 140: 15-18; Exhibit B at 84: 4-14). This was not a moment of emergent threat, nor was the force calibrated to a legitimate security need. (See Ex A at 135 at 5-8; Ex A at 140:15-18). Rather, Defendants' action was a gratuitous infliction of pain and/or control, violating New York State standards of permissible force. ICE federal officers' use of force to re-restrain Plaintiff was objectively unreasonable and lacked privilege and constituted assault and battery under the Federal Tort Claims Act (FTCA). (See Statement of Facts).

Additionally, the record shows that Defendants offer no rebuttable evidence that their physical contact with Plaintiff was consensual, as required under both ICE protocols and New York law. (See Ex. A 184–186; Ex. B 298:13–22.) Plaintiff was seated, unrestrained, and compliant when officers entered the cell without issuing verbal commands. (Ex. A 134–135, 140:15–18; Ex. B 84:4–14, 202:10–23.) Defendants provide no justification explaining how or why Plaintiff who was still compliant was violently slammed to the ground by multiple ICE officers, several of whom placed knees on his back and neck. (Ex. A 135, 178; Ex. B 178, 204–205, 238–239.) Absent any evidence that Plaintiff physically resisted before being touched, the force used at the point of initial contact was unjustified and excessive under New York law. The facts and testimony thus support a finding of objectively unreasonable excessive force and thus unprivileged assault and battery under the FTCA.

Because Plaintiff was compliant, posed no threat, and received no verbal commands before

being violently forced to the ground, Defendants' actions constitute unprivileged assault and battery under New York law and the FTCA waives immunity for this intentional tort. Accordingly, summary judgment should be granted in Plaintiff's favor on his FTCA assault and battery claim.

## POINT II

### PLAINTIFF's MOTION FOR SUMMARY JUDGMENT FOR HIS NEGLIGENT GUARD CLAIMS AGAINST ICE UNDER FTCA §1346(b) MUST BE GRANTED AS IT IS UNDISPUTED THAT ICE OFFICERS FAILED TO GUARD PLAINTIFF AGAINST UNREASONABLE INJURY.

Under the FTCA § 1346(b), a guard's failure to supervise, patrol, or act with reasonable attentiveness that results in harm is actionable. Claims involving simple negligence, such as a guard's failure to supervise or patrol, may not fall within the discretionary function exception since they do not involve policy judgment. Suk Chang v. United States, 139 F.4th 1087, 1097 (9th Cir. 2025). If a federal employee violates a mandatory directive, then the discretionary function exception does not apply. Berkovitz v. United States, 486 U.S. 531, 544 (1988). The Second Circuit recognized a "negligent guard" theory under FTCA that holds that if a guard fails to supervise or respond appropriately through their own "laziness, hastiness, or inattentiveness", the United States is liable under the FTCA. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475-76 (2d Cir. 2006). Specifically, this negligence is distinct from discretionary acts and supports FTCA liability. Id. The discretionary function exception to the FTCA, found in 28 U.S.C. § 2680(a), bars liability only where the challenged conduct involves an element of judgment or choice grounded in public policy considerations. However, where a federal officer negligently implements a policy or fails to follow mandatory procedures, courts, including the Second Circuit, have repeatedly held that the discretionary function exception does not apply. Triestman v. Fed. Bureau of Prisons, 470 F.3d at 476. The Second Circuit held that if the government has established a mandatory policy or directive, then its employees do not have discretion to deviate from those policies, and the discretionary

function exception would not bar the FTCA claims. Id. at 475-76. If the conduct does not involve any legitimate policy judgment such as negligent performance of a ministerial act, then the discretionary function does not apply. Id. A prison guard's failure to inspect exercise equipment, despite being a requirement by institutional policies, was held as not discretionary. Coulthurst v. United States, 214 F.3d 106 (2d Cir. 2000). Courts have consistently ruled that such failures in execution are actionable under the FTCA, and that "careless conduct" and "operational negligence" fall outside the exception. Berkovitz v. United States, 486 U.S. at 547. Additionally, correctional officers' failure to follow established procedures or take protective action against inmate harm was not protected as discretionary by Ninth Circuit courts. Alfrey v. United States, 276 F.3d 557, 567 (9th Cir. 2002).

Here, ICE protocol required that: (1) verbal warnings be issued before any use of force. (See ICE PBNDS 2.8 & 2.15 (Levels 1-2)); detainees are given an opportunity to comply voluntarily. (See ICE PBNDS 2.8 & 2.15 (must exhaust non-force options)); and the use of "active resistance" tools like the Humane Restraint blanket is used only after confirmed physical resistance by a detainee. (See ICE PBNDS 2.8 & 2.15)[1]. Additionally, according to the fact record, it is undisputed that (1) Plaintiff was seated, compliant, and unrestrained (See Felix Nkansah Deposition, Ex A 134-138); no verbal commands were given (See Officer Weidlein Deposition, Ex B 279 9-13); the decision to use force was made in advance, without situational necessity (See Ex B 238-239 22-12; Ex B pg 282-283); and ICE officers admitted they do not recall how or why force was applied, and offered no evidence of any resistance before first contact. (See Ex A at 206-207.) The record is clear and undisputed in showing that Plaintiff was compliant, unrestrained, and isolated when ICE officers for no objective legitimate reason forcibly subdued, chained, and battered Plaintiff without

---

[1] See also: U.S. Immigration & Customs Enforcement, *Use of Force and Restraints*, https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf; Exhibit O.

justification, warning, or dialogue. Supervisory and line officers alike failed to offer any countervailing evidence. Under Triestman's negligent guard theory, this amounts to negligent execution of governmental duty, which is not protected by the discretionary function exception. Defendants were inattentive to Plaintiff's compliance and failed to follow ICE protocols. Their decision to forcefully restrain Plaintiff, without verbal command or apparent need, clearly reflects negligence in execution and supervision. Plaintiff was transported from Hudson to Varick, restrained, compliant, and segregated into a single-cell room, and was then unrestrained, with no verbal prompts from ICE officers. (See Exhibit B at 189-190: 21-7. Subsequently, four ICE officers forcibly entered, subdued, battered, and re-cuffed Plaintiff without warning or lawful assertion of resistance. (See Ex A pg 135 ln 17-21; Ex B pg 282-283). ICE Officer Weidlein, the supervisor, then inexplicably ordered the use of a Humane Restraint Blanket before any verbal or physical contact was made. (See Exhibit B at 196:5-10). All senior ICE officers, including Weidlein and Folajaiye, testified that neither had any independent recollection of the incident, even after being shown the videos of the assault and therefore provided no factual explanation or rebuttal, other than blind reliance on a common protocol meant for active resistors. (See Ex B 221 11-19, See Ex B pg 282-283, See Officer Folajaiye Deposition, Ex C 21-2, 32-33, 38). The governing facts here are indistinguishable from those in Triestman because ICE supervisors ordered immediate forceful restraint of an unrestrained, inert, and fully compliant detainee without warning or justification. (See Ex B 190 13-24, See Ex B pg 282-283). These facts establish a careless, inattentive failure to comply with ICE protocols, which require verbal warnings, de-escalation, and only responsive force when warranted[2]. Under the Triestman requirements, the ICE guards failed through carelessness and/or inattention by ordering a Human Restraint Blanket without basis, and officers used force

---

[2] See also: U.S. Immigration & Customs Enforcement, *Use of Force and Restraints*, https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf; Exhibit O.

without protocol or warning. (See Exhibit B at 196:5-10.) The decision to use force clearly violated routine ICE procedures and discretion. All senior ICE officers admit lacking any suspicion, refusal to comply, or warning issued.  (See Exhibit A at 279:10-13; Exhibit B at 184-85:20-25; Exhibit B at 58:9-20.) Clearly, the Defendant's own admissions demonstrate negligence, not discretionary policy decisions. Therefore, per Triestman, summary judgment should be granted.

Because the record contains no contrary evidence, summary judgment in Plaintiff's favor is warranted because it is undisputed that ICE officers failed to guard plaintiff against unreasonable injury since they failed to follow mandatory directives. Plaintiff's claim arises from negligent implementation, rather than development, of policy, and ICE's conduct is not shielded by the discretionary function exception. ICE officers neglected their duty to safeguard a compliant detainee, failed to follow mandatory verbal-warning procedures, and pre-authorized unnecessary force, and thus breached their duty of care. Therefore, Plaintiff is entitled to summary judgment on his FTCA negligent guard claim.

### POINT III
### PLAINTIFF's NEGLIGENCE CLAIMS AGAINST ICE MUST BE GRANTED AS IT IS UNDISPUTED THAT ICE OFFICERS WERE NEGLIGENT IN THEIR DUTY TO PREVENT INJURY TO PLAINTIFF.

Under New York law, a negligence claim requires proof of (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages. Golden First Mortg. Corp. v. Berger, 251 F. Supp. 2d 1132, 1141 (E. D. N. Y. 2003). Gross negligence involves reckless disregard for the rights of others or a failure to exercise even slight care. Colnaghi, U.S.A. v. Jewelers Prot. Servs., 81 N.Y.2d 821, 823 (2d. Cir. 1993). It is well settled that correctional and custodial officials owe individuals in their custody a duty to exercise reasonable care in matters of supervision, handling, and the application of force. Kagan v. State of N.Y., 221 A.D.2d 7, 11 (N.Y. App. Div. 1996). In New York, courts have consistently held that liability may arise where officers

deviate from established custodial protocols and that they have a duty to use reasonable care to protect its inmates from foreseeable risks of harm. Colon v. State of N.Y., 209 A.D.2d 842, 843-44 [3d Dep't 1994]. Moreover, the duty of care includes the obligation to prevent foreseeable harm and to use force only in a manner that is necessary and proportional. Lewis v. State of N.Y., 223 A.D.2d 800 [3d Dep't 1996]). ICE agents were required to follow their own protocols (Ex O: ICE Use of Force Directive No. 11032.3), which mandate verbal de-escalation before applying force. FTCA waives sovereign immunity for negligence that "a private person would be liable…under the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Here, the undisputed facts show that ICE officers negligently used force, without legal grounds, to restrain a Plaintiff. The absence of warning, failure to follow procedure, and excessive physical force was unreasonable and constitutes a breach for which the United States is liable. Graham v. Connor, 490 U.S. 386, 396 (1989). Specifically, ICE agents failed to comply with the agency's own governing policy, the ICE Use of Force Directive No. 11032.3, which mandates verbal de-escalation prior to applying physical force (See Ex O). This departure from protocol, when viewed in conjunction with the excessive and unnecessary force inflicted upon Plaintiff while in custody, constitutes a breach of the well-established duty to act with reasonable care under both state tort principles and federal standards of custodial conduct. The undisputed record shows 1) Plaintiff was fully compliant, unrestrained, alone, and had committed no violation; (See Ex B pg 282:2-21, 283-84:2-22); 2) No officer issued a verbal command to re-restrain or otherwise instruct Plaintiff; (See Ex B at 279:9-13); 3) ICE officers entered the cell in force with a pre-ordered use of a "humane restraint blanket"; (See Ex B at 199:3-5); and Plaintiff was slammed to the ground, held down, punched and kicked, without warning. (See Ex A at 135:3-21, See Ex B at 266:16-23). No ICE officer has testified to any threat, non-compliance, or justification for the use of force prior to the first physical contact. The decision to subdue Plaintiff with physical force was made before any

engagement occurred. This is a clear breach of duty under <u>Mendez v. City of N.Y.</u>, 137 A.D.3d 468 (1st Dep't 2016). The record demonstrates that Plaintiff's injuries were directly caused by the ICE officers' use of excessive and unnecessary force. (<u>See</u> Dr. Figarola Report, Exhibit D at 2; <u>See</u> Exhibit D at 7). The attack by ICE personnel caused both physical pain and emotional distress to Plaintiff. (<u>See</u> Exhibit D at 2-8).

As a result, Plaintiff suffered: (1) Physical injuries from the force used during unprovoked takedown and chaining; (<u>See</u> Ex D pg 6; Ex D at 2.); (2) Emotional injuries from being assaulted while helpless and watched by other ICE officers; (<u>See</u> Dr. Zwirn Report, Ex Q at 14 and 15); as well as (3) Reputational and psychological trauma from being videotaped while being held down and restrained. (<u>See</u> Exhibit D at 8; <u>See</u> Exhibit P).  Medical records provided by the defendant do not dispute that Plaintiff suffered psychological injury as a result of the impermissible contact. (See Ex Q at 14, 15). Plaintiff was compliant during transportation and posed no threat while unrestrained in the cell. (See Ex B pg 282-283). Despite this, Officer Weidlein ordered the use of physical force and a Humane Restraint Blanket without evidence of active resistance. (<u>See</u> Exhibit B at 196:5-10.) The officers breached their duty to handle detainees with care, and their actions directly caused the plaintiffs injuries. The defendants' conduct, including slamming the plaintiff to the ground and punching and kicking him, constitutes gross negligence as it demonstrates reckless disregard for his safety. <u>Kerman v. City of New York,</u> 374 F.3d 93, 117 (2004). Additionally, the testimony of ICE supervisors Officer Weidlein and Officer Folajaiye confirms the central facts: (1) Neither saw Plaintiff before force was used; (See Ex B 240:8-19); (2) Neither recalls issuing any verbal instruction; (See Ex B 76:13-19; Ex C 34:21-25); and (3) that both admit the decision to use force was made in advance, based on no observable resistance. (See Ex B 240: 8-19). No officer claims Plaintiff posed a threat, refused to be restrained, or behaved violently. (See Ex B at 282: 5-22, Ex C

at 235-27:24-8). The absence of any articulable rationale renders Defendant's conduct negligent as a matter of law.

Ultimately, the undisputed facts establish that ICE officers breached their duty of care by unjustifiably using force on Plaintiff, who was compliant, unrestrained, and alone in a cell, without issuing any verbal command or warning. (See Ex B 279:9-13). As a result, Plaintiff suffered physical and emotional injuries. (See Ex E at 1). Defendants can offer no triable rebuttal facts to these essential facts. Therefore, Plaintiff is entitled to summary judgment for his negligence claims against Defendant. Ultimately, summary judgment is appropriate.

## <u>POINT IV</u>

### <u>PLAINTIFF's GROSS NEGLIGENCE CLAIMS AGAINST ICE MUST BE GRANTED AS IT IS UNDISPUTED THAT ICE  WERE NEGLIGENT IN THEIR HIRING, TRAINING AND RETENTION OF THESE OFFICERS WHO FAILED  TO PREVENT INJURY TO PLAINTIFF.</u>

Under the FTCA, the United States is liable to the same extent as a private person under the law of the place where the act occurred. <u>Richards v. United States,</u> 369 U.S. 1, 2-3 (1958). Under New York law, gross negligence is defined as conduct that includes a "reckless disregard" for the rights of others or intentional wrongdoing. <u>Colnaghi, U.S.A. v. Jewelers Prot. Servs.,</u> 81 N.Y.2d 821 (1993). The tort of negligent hiring, training, supervision, or retention arises where (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) The employer knew or should have known of the employee's propensity for the conduct; and (3) that the tort was committed on the employer's premises or with the employer's chattels. <u>Ehrens v. Lutheran Church,</u> 385 F.3d 232 (2d Cir. 2004). Gross negligence claims concerning hiring and training are viable under the FTCA when they reflect serious disregard of manifest duty. <u>Molchatsky v. U.S.,</u> 778 F.Supp.2d 421, 437 (S.D.N.Y. 2011). The FTCA permits claims for negligent training and supervision when federal employees fail to follow mandatory policies. <u>Coulthurst v. United States,</u>

214 F.3d 106, 108 (2d. Cir. 2000). The United States Supreme Court has held that the intentional tort exception under the FTCA did not apply to a claim of negligence against the United States for allowing a heavily intoxicated off-duty serviceman to leave a naval hospital with a loaded rifle, which he used to cause injuries, where the Court emphasized that the serviceman's employment status and state of mind were irrelevant to the claim for money damages based on the negligence of federal employees in failing to prevent harm. Sheridan v. United States, 487 U.S. 392, 401-03 (1988).

Here, the facts are undisputed: Plaintiff, an unrestrained and compliant detainee, was violently taken to the ground, punched, kicked, and bound without any verbal warning or lawful instruction. Here, the undisputed facts show that ICE personnel (1) Ordered a full-force takedown of Plaintiff before any verbal engagement; (See Ex B at 279:10-13); (2) Failed to follow agency protocols requiring de-escalation, commands, and documentation; (See Ex A at 184-186); (3) Provided no explanation for Plaintiff's sudden solitary placement; (See Exhibit B at 100:15-25; Exhibit B at 87-88:25-24.); (4) Used a Humane Restraint Blanket, rarely deployed and reserved for active resistors, without justification; (See Ex B at 199:3-5); (5) Offered no evidence of review, correction, or re-training of officers involved. These failures, taken together, rise far above ordinary negligence and reflect "reckless disregard" for ICE's duties under both internal policy and New York law. The decision to use a rare restraint protocol like the Humane Restraint Blanket and spit hood was ordered by ICE supervisors without any legitimate basis. (See Exhibit B at 201:21-24; Exhibit B at 87-88:25-24.) Ultimately, these failures demonstrate a systemic lack of training, supervision, and accountability within ICE operations.

Despite this, ICE offered no disciplinary action, retraining, or oversight. This institutional failure demonstrated by repeated protocol violations, a lack of corrective documentation, and the inability of multiple senior officers to justify the use of force, clearly constitutes gross negligence in

supervision and retention. No ICE official has provided a single policy-based reason for the use of force or the selection and training of the officers involved. By failing to properly train and supervise officers, and by allowing reckless use of force on a compliant detainee without oversight or correction, ICE acted with gross negligence. Therefore, Plaintiff moves for Summary Judgment on his claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b)(1), for gross negligence in the hiring, training, supervision, and retention of ICE officers.

Furthermore, the Second Circuit has held that failure to conduct training or supervision according to established policy is not discretionary. Coulthurst v. United States, 214 F.3d 106, 108 (2d Cir. 2000). Where protocols exist, and ICE officers fail to follow them, the government cannot claim immunity. Id. Accordingly, ICE's failure to properly train and supervise its officers is not shielded by the discretionary function exception because "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Berkovitz v. U.S., 486 U.S. at 536. To establish a claim for negligent hiring, training, or supervision, there must be proof that the employer knew or should have known of the employee's propensity for the conduct that caused the injury and that the conduct occurred outside the scope of employment. D.T. v. Sports & Arts in chs. Found., Inc., 193 A.D.3d 1096, 1096 (2021).

Here, ICE's use of force protocols required a verbal order, assessment of resistance, and measured response, none of which occurred. (See Ex B 279 9-13). The plaintiff alleges that the ICE officers involved were inadequately trained and supervised, as evidenced by their failure to follow ICE use-of-force protocols and their unjustified use of excessive force. Officer Weidlein admitted that the use of a Humane Restraint Blanket and physical force was rare and that he had no record of the plaintiff posing a violent risk. (See Ex B: 199 3-5, Ex B 228 11-15, Ex B: 282-283). Senior ICE official Officer Weidlein ordered the use of rare force methods before any officer had contact with

Plaintiff. He testified that: (1) He had no record of Plaintiff's posing any threat; (See Ex B pg 282-283); (2) He never issued instructions or ensured verbal warnings were given; (Ex C 34 21-25); (3) He was unaware of how Plaintiff got to the floor; (See Ex B 178); (4) He had no recollection of whether officers acted according to policy; (See Ex A pg 184-186); and (5) He saw no active resistance, even during the alleged "resisting" incident. (See Ex B 190 13-24), (See Ex B 204 -205 24-6). Accordingly, the defendants failure to properly train and supervise the officers directly contributed to the plaintiffs injuries <u>Fiedler v. Incandela</u>, 222 F. Supp. 3d 141. No rational jury could conclude that ICE officers, operating under Officer Weidlein's unprovoked, pre-planned order to physically subdue Plaintiff who was a passive detainee, were properly trained or supervised. Nor could any jury reasonably find that ICE took any corrective action, despite overwhelming evidence of deviation from protocol and excessive force.

Therefore,  Plaintiff respectfully requests that this Court grant summary judgment on his gross negligence claim under the FTCA for the negligent hiring, training, supervision, and retention of ICE officers.

### <u>POINT V</u>

### <u>PLAINTIFF's NEGLIGENT INFLICTION OF EMOTIONAL OF DISTRESS CLAIM AGAINST ICE MUST BE GRANTED AS IT IS UNDISPUTED THAT ICE WAS NEGLIGENT IN THE MANNER OF RE-RESTRAINING PLAINTIFF AND THAT PLAINTIFF HAS SUFFERED EMOTIONAL DISTRESS AS A RESULT OF THEIR NEGLIGENCE.</u>

Under New York law, NIED can be established under either the "bystander" theory, or the "direct duty" theory, which applies here. The "direct duty" theory establishes that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty in a negligent manner; (3) the conduct was so extreme and outrageous that it unreasonably endangered the plaintiff's physical safety or caused the plaintiff to fear for his own safety; and (4) The plaintiff suffered serious

emotional distress as a result. <u>Taggart v. Costabile</u>, 131 A.D.3d 243, 256 (2d Dep't 2015); <u>Brown v. New York</u>, 202 A.D.3d 1078 (2d Dep't 2022). This "unreasonable endangerment" standard allows recovery even absent any physical injury, if the emotional harm is genuine, substantial, and foreseeable. <u>Sheppard-Mobley v. King</u>, 10 A.D.3d 70, 74 (2d Dep't 2004). New York is split on whether outrageous conduct is required for NIED. In <u>Taggart</u> and other Second Department cases, outrageous conduct is not required for NIED because physical injury or reasonable fear of injury suffices. The FTCA provides a limited waiver of sovereign immunity, making the United States liable in the same manner and extent as a private individual under similar circumstances. 28 U.S.C. § 1346(b)(1). Federal detainees in ICE custody are owed a duty of care, particularly during restraint procedures. <u>Prado v. Perez</u>, 451 F. Supp. 3d 306, 313-14 (S.D.N.Y. 2020); <u>Benjamin v. Fraser</u>, 264 F.3d 175, 188, 190 (2nd. Cir. 2001).

Here, Plaintiff was subjected to unexpected, unnecessary, unjustified, physical force while fully compliant, which directly caused emotional and physical trauma. (<u>See</u> Exhibit B at 190:4-7; <u>See</u> Exhibit B at 176: 16-20; <u>See</u> Exhibit A at 66:13-18; <u>See</u> Ex P at 1; <u>See</u> Exhibit E at 1; Ex Q at page 15). Even requiring extreme and outrageous conduct absent severe bodily harm, the abrupt, unjustified assault is sufficient to sustain NIED under New York's "direct duty" theory. The uncontroverted evidence demonstrates that Plaintiff, while alone, unrestrained, and compliant in an ICE detention cell, was suddenly attacked by multiple federal officers who entered the cell without warning or verbal commands, threw him to the ground, struck him, and forcibly applied restraints. (<u>See</u> Exhibit A at 135:7-10; Exhibit A at 141-142:9-24; Exhibit A at 135:9-10; Exhibit A 141-142:9-20; Exhibit A at 135:10-18; Exhibit A at 135:13-14.) He was then left on the floor with a spit hood over his head while other officers looked on. (<u>See</u> Exhibit A at 136:24-25.) The emotional trauma suffered by Plaintiff, marked by terror, helplessness, and a well-grounded fear of death,

constitutes a legally cognizable injury under the New York common law of torts, which governs FTCA claims arising from conduct within New York. Plaintiff's emotional distress was foreseeable, severe, and proximately caused by ICE officers' grossly negligent conduct, warranting summary judgment in his favor. Plaintiff respectfully submits this memorandum of law in support of his motion for summary judgment on his claim for Negligent Infliction of Emotional Distress ("NIED") under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1).

   The conduct here was not routine, but rather extraordinary because: (1) Plaintiff was sitting alone in a cold room, unrestrained and compliant; (See Ex A 134-138); (2) Without warning, ICE officers entered and immediately used force; (See Ex A at 144: 23; Ex A at 151:2-4) (See at 135: 9-10) (See Also Ex A at 141-142:12-20); (3) No verbal commands were given before physical contact;  (See Ex A 144-23)( Ex A 151 2-4); (4) Plaintiff was slammed to the ground, punched, kicked, and forcibly restrained; (Ex A at 135:13-14); (5) He was placed in a spit hood, while ICE agents watched; (See Ex A at 136 24-25); (6) Plaintiff believed he was going to die, and begged them to stop.  (See Ex A at 135-136:24-4). No ICE officer has disputed these core facts. Supervising Officer Weidlein testified that he did not witness any active resistance, nor issue any verbal order, yet had pre-authorized force. (See Exhibit A 141:2-12; Exhibit B at 279:9-13.)

    There is no record of de-escalation efforts, psychological review, or any justification for the takedown. (See Ex B at 90:9-14; Video Ex H 0:23-0:25 sec; Video Ex G at 1:53-2:02). Plaintiff testified as follows, that he: (1) Was terrified; (2) Feared he would be beaten to death; (See Ex A 143:22-25); (3) Cried out in desperation and pleaded for mercy; (See ex Ex A 143:22-25); (4) Believed he might die alone on the floor; (See Ex A at 135:22-25); (5) Remained immobilized, humiliated, and helpless under observation. (See Ex A at 147:2-25). Such conduct, carried out by agents of the United States, in violation of ICE use-of-force policy, clearly meets the "outrageous

and extreme" threshold which is conduct that intentionally or recklessly causes severe emotional distress to another. Howell v. New York Post Co., Inc., 612 N.E.2d 699, 702 (1993). Therefore, it was entirely foreseeable that forcibly assaulting an unrestrained, compliant Plaintiff without cause would induce extreme emotional distress, especially given ICE's own policy prohibiting such tactics.

Though the FTCA bars NIED claims "arising out of" assault or battery (28 U.S.C. § 2680(h)), courts in the Second Circuit have consistently held that claims based on negligence resulting in emotional distress remain actionable, so long as the claim is not simply a relabeled intentional tort. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). Here, the basis for the claim is negligence in supervision, restraint procedure, and emotional safeguarding of detainees, not solely the physical conduct itself. Plaintiff has demonstrated that: (1) ICE owed him a duty of reasonable custodial care; (2) ICE agents acted in an unreasonably dangerous, outrageous, and reckless manner and (3) Plaintiff was placed in legitimate fear for his life and suffered real, foreseeable emotional trauma. In our case, Plaintiff experienced severe emotional distress, including fear for his life, as a result of the Defendants' actions. (See Ex A at 135: 3-25; Ex A at 135-136:24-4; See Exhibit A at 66:13-18). The circumstances, including the plaintiffs unusual solitary confinement and then officers gratuitous excessive force, provide a guarantee of the genuineness of the harm. (See Ex A 135 3-25; See Ex B 298 13-22; See Exhibit A at 66:13-18.). Clearly, Defendants' conduct breached their duty to handle detainees with care and caused the plaintiffs emotional harm.

Accordingly, Plaintiff respectfully requests that this Court grant summary judgment on the claim for Negligent Infliction of Emotional Distress under the FTCA.

**POINT VI**

**DEFENDANTS' TESTIMONY AND DOCUMENTARY EVIDENCE FAIL TO PROVIDE ANY EVIDENCE TO REBUT PLAINTIFF'S CLAIMS.**

Under Fed. R. Civ. P. 56(a), Summary Judgment is granted when "there is no genuine dispute as to any material fact." The Second Circuit has held that a party may not survive a summary judgment motion merely by stating a hypothetical issue of material fact, and the opposing party must do more than show there is some doubt to the material facts and cannot rely on "conclusory allegations or unsubstantial speculation." Robinson v. Concentra Health Services, 781 F.3d 42, 44 (2d. Cir. 2015). It is well-settled that summary judgment must be granted where the nonmoving party fails to produce admissible evidence sufficient to establish a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005). Additionally, under Fed. R. Civ. P. 56(e), a party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). Courts in this Circuit routinely find that such "institutional amnesia" does not rebut competent and specific opposing evidence. As the Second Circuit explained how "conclusory statements and improbable assertions" cannot create a triable issue when unaccompanied by specific evidence. Jeffreys v. City of New York, 426 F.3d at 555. Furthermore, speculative testimony based solely on video review and not grounded in personal knowledge is inadmissible under Rule 56(c)(4). Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d). Here, the testimony of ICE supervisors Weidlein and Folajaiye is systematically non-responsive, evasive, and lacking personal knowledge and clearly insufficient under Rule 56. Moreover, New York courts have held that testimony which "fails to offer competent counter-evidence" is not enough to create a triable issue, particularly where officers "failed to follow protocol" or failed to "issue verbal commands"

prior to using force. <u>Kavazanjian v. Rice</u>, 2005 WL 1377946, at *5 (N.D.N.Y. June 6, 2005).

Here, the material facts, supported by deposition excerpts and video evidence, are undisputed: (1) Plaintiff was alone, seated, unrestrained, and fully compliant in his cell when multiple ICE officers forced him to the ground, kicked, punched, shackled, and hooded him. (See Exhibit A pg 140:15-18; Exhibit B at 84:4-14; Ex A at 135:13-14; Ex A at 136:24-25); (2) No officer issued any verbal command to comply before physical contact. (See Ex B at 279:9-13); (3) Supervisors Weidlein and Folajaiye admit they ordered use of force and the humane restraint blanket before any engagement, but cannot recall or rebut any critical factual point where Plaintiff resisted, stood, or was warned. (See Ex B 195 5-11; Ex B 199 3-5); These admissions alone establish that ICE's use of force was unjustified and that supervisors failed to follow policy.

Additionally, Defendant Officer Thomas Weidlein's testimony, riddled with evasions, memory lapses, and total deference to video evidence, does not present the kind of affirmative, first-hand factual contradiction required to preclude summary judgment. Defendant Weidlein's testimony is clearly insufficient to raise a genuine factual dispute and cannot defeat summary judgment. Officer Weidlein repeatedly testified that he does not know who first touched the Plaintiff, whether any verbal commands were issued to the Plaintiff, whether Plaintiff was seated or prone at the moment ICE officers entered, or even how Plaintiff came to be on the floor. (See Ex B at 176:9-23, 177:13-25, 178:2-19, 179:18-25, 180:2-5, 185:3-20, 238-39:22-8, 279:7-13.) Indeed, testimony from both Officer Weidlein's and Folajaiye, which lacks memory of all salient material facts and is uncorroborated by independent recollection, "fails to raise a genuine dispute as to any material fact." <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 743–44 (2d Cir. 2003). Evasion and lack of personal recollection is not competent evidence under Rule 56. Officer Weidlein admits that he would not have remembered the incident at all had he not reviewed the ICE video footage, and further concedes that he remembers only what the video shows, and nothing before or after. (See Ex

B at 296-297:24-5.) Weidlein's reliance solely on video and the inability to recall off-video context fails Rule 56(e). Nowhere in Officer Weidlein's deposition or any ICE documentation is there an affirmative claim that Plaintiff was given verbal commands to comply with ICE re-restraint protocol, or that Plaintiff physically or verbally resisted prior to the first use of force. Nor does Weidlein or any other officer testify that Plaintiff was combative, threatening, or attempting to escape when they entered the cell. Speculation and "institutional amnesia" do not create genuine factual disputes. Jeffreys v. City of New York, 426 F.3d at 555. Defendant Weidlein offers no explanation for why Plaintiff was thrown to the ground while seated and unrestrained, why multiple ICE officers converged on Plaintiff without issuing verbal instructions, or why ICE protocols were not followed. His inability to rebut these allegations is central to Plaintiff's claims of excessive force and FTCA tort violations and renders Defendant's testimony insufficient to defeat summary judgment. Scott v. Harris, 550 U.S. 372, 380 (2007); Jeffreys v. City of New York, 426 F.3d at 555.

Therefore, summary judgment must be granted because Defendants fail to offer any competent counter-evidence and there is no genuine dispute of material fact.


## POINT VII

### PLAINTIFF SUFFERED DAMAGES DUE TO DEFENDANT'S NEGLIGENCE BECAUSE UNDISPUTED MEDICAL EVIDENCE ESTABLISHES PLAINTIFF'S PTSD DIAGNOSIS, ONGOING DISABILITY, AND CAUSAL CONNECTION TO INCARCERATION.

Under New York law, to establish a prima facie case of negligence, a plaintiff must demonstrate: (1) the defendant owed a duty of reasonable care; (2) the defendant breached that duty; and (3) the breach was the proximate cause of the plaintiff's injury or damages. Second Circuit courts have held that breach of a duty owed to the plaintiff resulting directly in emotional harm is compensable even if no physical injury occurred. Ornstein v. New York City Health & Hosps. Corp., 10 N.Y.3d 1, 6 (N.Y. 2008). Additionally, under New York law, Second Circuit courts have held that

"freedom from mental disturbance is now a protected interest in this State." <u>Ferrara v. Galluchio</u>, 152 N.E.2d, 249, 252 (N.Y. 1958).

The undisputed medical evidence demonstrates that Plaintiff suffers from chronic and disabling post-traumatic stress disorder (PTSD) and related psychiatric conditions that were directly caused by his incarceration by Defendants from December 17, 2014, to March 2016. Plaintiff was formally diagnosed with PTSD and Dysthymic Disorder on December 5, 2016 (<u>see</u> Dr. Lucas Report, Ex E at 1), and his cumulative Medicaid expenditures for PTSD-related treatment from that time through 2025 total approximately $96,318. (<u>See</u> Past Medical Costs Report, Exhibit F at 4). Doctors Roger Buck and Zwirn, employed by Defendants, do not deny that Plaintiff experienced the symptoms he had reported, and despite mentioning that there was possibility of "malingering" or exaggeration of his symptoms, they still did not deny the existence of his symptoms as a result of his traumatic incident with ICE. (<u>See</u> Ex Q at 14 and 15).

Dr. Zwirn, employed by Defendant(s), does not deny Plaintiff's diagnosis of PTSD by Dr. Lucas and reports it is possible that Plaintiff suffered from PTSD symptoms. (<u>See</u> Ex Q at page 15) Dr. Zwirn reported that the events of August 17, 2015, as reported by Mr. Nkansah, would rise to the level of a possible cause of PTSD and the symptoms that Mr. Nkansah has described, if accurately reported, would support a diagnosis of PTSD. (<u>See</u> Ex Q at page 15). Additionally, psychiatric evaluations by Dr. Carlos J. Figarola consistently confirm the causal link between Plaintiff's incarceration and his psychiatric deterioration. (<u>See</u> Exhibit D at 2, 8). As of his release in March 2016, Plaintiff was unable to walk unaided, could not access his bedroom, suffered from severe sleep disturbances, disorganization, and irritability, and was unable to return to work or school. (<u>See</u> Dr. Roger Buck Neurological Assessment, Ex Y at 1 of 7; See Ex D at 2-8). Dr. Figarola's report further affirms that Plaintiff remains seriously ill and disabled, requiring ongoing treatment as a direct result of his incarceration. (See Ex D at 2 and 8). These facts are unrefuted and legally sufficient to meet

the standard set forth in <u>Farmer v. Brennan</u>, 511 U.S. 825, 828, 835 (1994), which holds that deliberate indifference to a prisoner's serious medical needs constitutes a violation of the Eighth Amendment. The evidence here satisfies both the objective prong, demonstrating a serious medical condition, and the subjective prong which establishes that the harm was incurred as a result of the conditions imposed by Defendants.

Defendants do not dispute that Plaintiff suffers from PTSD as diagnosed by Dr. Figarola. Although Defendants' expert speculates that Plaintiff's symptoms may be "exaggerated" or that there are "malingering" symptoms, they offer no evidence rebutting the actual diagnosis itself or disputing that the assault and excessive force were a substantial contributing cause. Thus, any alleged exaggeration affects only the amount of damages, not liability.

CONCLUSION

Overall, ICE officers' testimonies are not only vague and speculative, but they are institutionally constructed to obscure rather than clarify. Their admitted inability to recall how or why Plaintiff was first physically engaged, combined with the lack of any affirmative contradictory evidence, confirms that Plaintiff's account remains unrebutted. This lack of evidentiary opposition is particularly significant given the extensive and well-documented medical and psychiatric record confirming the severity of Plaintiff's injuries and their causal connection to his incarceration. Defendants own records of Plaintiff's injuries, their undenial of the existence of Plaintiff's PTSD symptoms as a result of his traumatic incident with ICE on August 17, 2015, the undisputed psychiatric evaluation by Dr. Carlos J. Figarola which is corroborated by Dr. Lucas's diagnostic findings, and Medicaid billing records totaling approximately $96,318 establishes that Plaintiff suffers from chronic PTSD and related impairments resulting from his confinement. Under well-established Second Circuit authority, Plaintiff is therefore entitled to summary judgment for his claims as a matter of law.

Dated: New York, New York
        July 18, 2025

                                          _____/S/_____
                                          Rehan Nazrali, Esq. (via Email, US Mail and
                                          ECF) 277 Broadway, 17th Floor
                                          New York, New York 10007
                                          Email: rnazraliesq@gmail.com

TO: -
US DEPT OF JUSTICE
AUSA Carly Weinreb
Attorney for Defendants USA
86 Chambers Street
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
FELIX NKANSAH,                                      Dkt No: 18 Civ. 10230 (PAE)


                            Plaintiff(s.),


-against-                                           PLAINTIFFS STATEMENT OF
                                                    UNDISPUTED FACTS  PURSUANT
                                                    TO LOCAL RULE 56.1


UNITED STATES OF AMERICA.
JOHN DOES #1- 36 (United States Immigration
and Custom Enforcement Agents,
Individually and in their Official Capacity.),


                            Defendant(s.).
-----------------------------------------------------------------X

Plaintiff FELIX NKANSAH, as and for his Response to Demand for Expert Witness Information

pursuant  to Local Civil Rule 56.1 of the Local Rules of the United States District for the Eastern

District of New York to set forth the material facts as to which Plaintiff contends there is no genuine

issue of fact to be tried[3].


      STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1


I.    <u>Plaintiff Remained Compliant During Transport from Hudson County, Including His
Unusual Separation from Other Detainees and Solitary Placement at Varick Street
Detention Center Before Any Physical Contact by ICE Officers.</u>

---

[3] As the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party
opposing the motion, see Mitchell v. Senkowski, 158 F. App'x 346, 348 (2d Cir. 2005.), where the facts set forth herein
are not undisputed, they are taken in the light most favorable to plaintiff. Defendants nonetheless reserve the right to
dispute such facts at trial.

26

1. On August 17 2015 at or about 5:30 am Plaintiff was woken up by ICE officers at Hudson County and told to be prepared for transportation out of Hudson County. (See Exhibit A at 119:5-6.)

2. Plaintiff and 16 other detainees were gathered to be transported to Varick street. (See Exhibit A at 119-120:16-4.)

3. Plaintiff did not resist being placed in restraints at any time while being transported from Hudson County Detention Center to Varick Street Processing Center. (See Exhibit B at 189-190: 21-7.)

4. The 16 detainees along with Plaintiff were transported in one van from Hudson County to Varick Street. (See Exhibit A at 119-20: 21-4.)

5. All the detainees , including Plaintiff were cuffed while they were in the van being transported from Hudson to Varick. (See Exhibit A at 120:18-19.)

6. The van from Hudson County transporting Plaintiff arrived at Varick Detention Center. (See Exhibit A Pg 119-120: 2-19.)

7. When Plaintiff arrived at Varick Street Detention Center, he along with other detainees were escorted in chains and cuffs by ICE agents from the Van to an elevator and then to a floor inside Varick Street Detention Center. (See Exhibit A at 120-22: 20-2.)

8. Once on the floor Plaintiff was separated from the rest of the Detainees and placed in a cell. (See Exhibit A at 122: 17-19; Exhibit B 84: 9-10.)

9. Plaintiff did not resist being placed in the cell room alone without any restraints. (See Exhibit A at 120-122: 20-11.)

10. Plaintiff's separation from the other detainees from Hudson County and his solitary placement in a separate cell from the other detainees he had been transported with was

unusual and a rare circumstance for an ICE detainee being transported from one facility to another through Varick Street Detention Center. (<u>See</u> Exhibit B at 100:15-25.)

11. Plaintiff was in the cell alone without any ICE officers or other detainees. (<u>See</u> Exhibit A at 137:17-23; Exhibit B at 84:9-10.)

<u>II. ICE Officers Are Ordered By Officer Weidlein To Prepare Rarely Used Active-Resistance Restraints i.e Humane Resistance Blanket ,For use on Plaintiff Before Any Physical and Or Verbal Contact With Plaintiff is initiated by any ICE Officer</u>

12.  Officer Weidlien was a supervisor of detention and deportation for the ICE transportation Unit located at Varick Street. (<u>See</u> Exhibit B at 18:2-8.)

13. On August 15, 2017 Officer Weidlien could order subordinate ICE officers to help him if necessary. (<u>See</u> Exhibit B at 21:13-22.)

14. Officer Weidlein oversaw ICE officers/agents who were responsible for the transfer and intake of detainees that would arrive and leave from the Varick Street Detention Center. (<u>See</u> Exhibit B at 23:7-11.)

15. Officer Weidlein admits to working at the Varick Detention Center on August 17, 2015. (<u>See</u> Exhibit B at 17:23-25.)

16. Officer Weidlein admits that he was the only person with authority at the time of the incident with Plaintiff who could have ordered the use of a Humane Restraint Blanket on the Plaintiff. (<u>See</u> Exhibit B at 195: 5-15.)

17. The Humane Restraint Blanket is only used on detainees that are actively resisting being placed in cuffs and chains. (<u>See</u> Exhibit B at 201:21-24.)

18. Officer Weidlein admits that the he gave order for the Humane Restraint Blanket to be used before he entered the Plaintiff's cell and he admits he did not give any instructions about its use at any time from when he first enters the cell through the time he was in the cell with the other ICE officers. (<u>See</u> Exhibit B at 196:5-10.)

28

19. Officer Weidlein admits to being on the 4th Floor of the Varick Street Detention Center at or about the time Plaintiff was also on the 4th Floor thereof. (<u>See</u> Exhibit B at 65:7-14.)

20. Officer Weidlein states that the first time he saw Plaintiff on that day was when Plaintiff was on the floor in the cell alone with other ICE agents surrounding him and placing him in chains and cuffs. (<u>See</u> Exhibit B at 75:9-16.)

21. Officer Weidlein states that he does not recall having any independent conversation with Plaintiff at any time on the subject day. (<u>See</u> Exhibit B at 76:13-21.)

22. Officer Weidlein stated that he does not recall any other ICE officer having any conversation with Plaintiff before seeing Plaintiff being restrained in chains and cuffs while on the floor in the subject cell. (<u>See</u> Exhibit B at 76-77:22-5.)

23. Officer Folajaiye stated that Officer Weidlein did not give any instructions to any officer while he was in the room. (<u>See</u> Exhibit C at 34:21-25.)

24. Officer Folajaiye stated that putting someone in a body wrap rarely happens at Varick Street Detention. (<u>See</u> Exhibit C at 37-38:15-11.)

25. Officer Folajaiye confirmed that Officer Weidlein made the decision to put Plaintiff in the body wrap before he entered the cell. (<u>See</u> Exhibit C at 38:17-21.)

26. Officer Folajaiye admits that he along with the other ICE officers who made contact with Plaintiff were given instructions before entering the cell to go over to the Plaintiff because of officer and detainee safety. (<u>See</u> Exhibit C at 32-33:19-2.)

<u>III. ICE Officers Entered the Holding Cell Without Warning or Verbal Commands and Forcibly Restrained Plaintiff.</u>

27. It was cold in the cell Plaintiff was detained in. (<u>See</u> Exhibit A at 134-135:21-2.)

28. Plaintiff was seated on the concrete bench he had his winter jacket on and put his head on his knee and hood over his head in an attempt to stay warm. (<u>See</u> Exhibit A at 134-135:21-2.)

29. Plaintiff was alone in the room for more than 30 minutes (See Exhibit A at 137:17-20.)

30. While Plaintiff was in the cell alone he was unrestrained by any cuffs, chains or other restraining devices. (See Exhibit A at 140:15-18; Exhibit B at 84:4-14.)

31. While Plaintiff was alone in the room he was upright and seated on a concrete chair/ cement bench. (See Exhibit A at 134:21-25.)

32. Plaintiff heard the sound of his cell door popping open (See Exhibit A at 135: 3-5.)

33. Plaintiff raised his head from his knee and looked up toward the door and saw three to four ICE officers rushing into the cell toward him. (See Exhibit A at 135:5-8; Exhibit A at 140:15-18.)

34. At no time did any ICE officer entering the cell say anything to Plaintiff before they first made physical contact with him after they first rushed in. (See Exhibit A at 141:2-18.)

35. Once ICE officers made first physical contact with the seated Plaintiff they wordlessly placed their hands on him and picked him from where he sat on the concrete bench. (See Exhibit A at 135:7-10; Exhibit A at 141-142:9-24.)

36. The four ICE officers slammed Plaintiff onto the floor. (See Exhibit A at 135:9-10; Exhibit A 141-142:9-20.)

37. The four ICE officers converged on top of Plaintiff while he was on the floor and pressed down on him on all sides of his body. (See Exhibit A at 135:10-18.)

38. Plaintiff repeatedly begged these officers to stop battering him. (See Exhibit A at 135:10-11.)

39. Plaintiff felt the knee of one of the officers on top of his body. (See Exhibit A at 135:12-13.)

40. Plaintiff felt being punched and kicked over his body by the ICE officers surrounding him. (See Exhibit A at 135:13-14.)

41. Plaintiff could not move his arms to cover his face. (See Exhibit A at 135:14-16.)

42. As Plaintiff continued to feel the kicking and punching to his body he felt his life was threatened and begged the officers to stop battering and attacking him. (See Exhibit A at 135:17-21.)

43. While Plaintiff was on the floor getting battered, he turned around to see multiple ICE officers standing at the door to his cell watching him getting battered by the other ICE officers. (See Exhibit A at 135:22-25.)

44. Plaintiff was put into further apprehension of his life and began to consider that he would die at the hands of all these ICE officers. (See Exhibit A at 135-136:24-4.)

45.  While Plaintiff  was watching the ICE officers by the door, he observed a female ICE officer holding her phone and video taping the encounter. (See Exhibit A at 136:8-11.)

46. When Plaintiff saw the female officer video taping he felt assured that there would be a video record of the encounter and he relaxed, laid down and put his hands by his sides. (See Exhibit A at 136:1-14.)

IV. Senior ICE Officers Present on August 17, 2015 Could Not Recall or Provide Evidence of Verbal Commands or Resistance by Plaintiff and Could Not Recall or Explain the First Physical or Verbal Contact with Plaintiff Before Force Was Used.

47. On August 17, 2015, while Plaintiff was at Varick Street Detention Center on the floor of the cell with the 4 ICE officers on top of him, Second Line Supervising Officer Thomas Weidlien entered Plaintiff's cell after it was first opened by the ICE officers who Plaintiff saw rushing in at him. (See Exhibit B at 177:9-12.)

48. Officer Weidlein admits that Plaintiff's transfer from Hudson County to Varick started as a normal transfer, nothing out of the ordinary. (See Exhibit B at 59:6-8.)

49. Officer Weidlein admits that where there are no transfer issues in the movement of a detainee he would not ordinarily get involved. (See Exhibit B at 59:12-15.)

50. Officer Weidlein admits to being on the 4th Floor of the Varick Street Detention Center at or about the time Plaintiff was also on the 4th Floor thereof. (<u>See</u> Exhibit B at 65:13-14.)

51. Officer Weidlein states that the first time he saw Plaintiff on that day was when Plaintiff was on the floor in the cell alone with other ICE agents surrounding him and placing him in chains and cuffs. (<u>See</u> Exhibit B at 75:14-16.)

52. Officer Weidlein states that he does not recall having any independent conversation with Plaintiff at any time on the subject day. (<u>See</u> Exhibit B at 76:13-19.)

53. Officer Weidlein stated that he does not recall any other ICE officer having any conversation with Plaintiff before seeing Plaintiff being restrained in chains and cuffs while on the floor in the subject cell. (<u>See</u> Exhibit B at 76-77:21-4.)

54. Officer Weidlein admits that Plaintiff was alone in his cell without any other detainee. (<u>See</u> Exhibit B at 84:9-10.)

55. Officer Weidlein admits that Detainees being transferred through Varick street are generally kept together in the same cell and when it is time to move them they are individually removed from the common cell, taken outside the cell and there they have the chains and cuffs placed on them again by ICE agents. (<u>See</u> Exhibit B 84-86:20-10.)

56. Officer Weidlein cannot recall any prior instance of any detainee refusing to come out of the cell and comply with an order to have chains and cuffs reapplied (<u>See</u> Exhibit B at 87-88:25-24.)

57. Officer Weildein admits that he was not made aware of any record that showed that Plaintiff was unable to walk. (<u>See</u> Exhibit B 108:6-19.)

58. Officer Weidlein admits that he cannot recall seeing Plaintiff before he first saw him on the floor with ICE officers kneeling around him attempting to put chains on him. (<u>See</u> Exhibit B 177-178:13-19.).

59. Officer Weidlein states that he does not recall seeing the Plaintiff seated at any time and does not recall how the Plaintiff got to the floor surrounded by ICE agents. (See Exhibit B 178:16-19.)

60. Officer Weidlein admits that if the officers were kneeling on the floor, then Plaintiff is also on the floor, even though he does not know how Plaintiff got on the floor. (See Exhibit B 178: 8-19.)

61. Officer Weidlein does not recall if Plaintiff was ever advised that he needed to cooperate in the replacement of the cuffs and chains. (See Exhibit B 184:20--25.)

62. Officer Weidlein does not offer any reason why the Plaintiff would be resisting the replacement of restraints he claims he was resisting in the video. (See Exhibit B 90: 9-14; Video Exhibit H at 0:23-0:25; Video Exhibit G at 1:53-2:02.)

63. At the point where someone in Video Exhibit H was heard stating "stop resisting", Officer Weidlein admitted that he could not see any noticeable active resistance by Plaintiff. (See Exhibit B at 190:13-24; Video Exhibit G at 1:53-1:55; Video Exhibit H at 0:23-0:25 sec.)

64. Officer Weidlein admits that Plaintiff was not fighting per se and that he only saw Plaintiff passively resisting. (See Exhibit B at 204 -205:24-6.)

65. Officer Weidlein does not know where the ICE officers who were holding down Plaintiff in the Video that he saw in the video one second before they entered into the cell. (See Exhibit B at 206:14-25.)

66. Officer Weidlein does not know how all the ICE officers in the room with Plaintiff came to be in the room with him and does not recall ever hearing any ICE officer requesting help with the Plaintiff. (See Exhibit B at 221:11-19.)

67. Officer Folajaiye stated that Officer Weidlein did not give any instructions to any officer while he was in the room. (See Exhibit C at 34:21-25.)

68. Officer Folajaiye stated that putting someone in a body wrap rarely happens at Varick Street Detention. (<u>See</u> Exhibit C at 37-38:15-11.)

69. Officer Folajaiye confirmed that Officer Weidlein made the decision to put Plaintiff in the body wrap before he entered the cell. (<u>See</u> Exhibit C at pg 38:17-21.)

70. Officer Folajaiye also has no memory of whether Plaintiff was seated or on the floor when he first saw him through the cell door window. (<u>See</u> Exhibit C at 38-39:24-4.)

71. Like Officer Weidlein, Officer Folajaiye also has no recollection of the rare events of August 17, 2015 without recourse to the Videos. (<u>See</u> Exhibit C at 235-27:24-8.)

<u>V. Officer Weidlein Ordered the Use of Physical Force on Plaintiff Before Any Verbal Commands Were Given or Resistance Occurred and In Violation of ICE Protocols.</u>

72. Officer Weidlein described a full take down of a detainee with restraints was a rare event at Varick Street for him. (<u>See</u> Exhibit B at 228:11-15.)

73. Officer Weidlein admits that at the start of the video  ICE officers were already using physical force to put the restraints on Plaintiff. (<u>See</u> Exhibit B at 238:18-21.)

74. Officer Weidlein admits that he does not recall any verbal commands issued to plaintiff before any of the restraints were placed on him. (<u>See</u> Exhibit B at 279:9-13.)

75. Officer Weidlein admits that the decision to use physical force on the plaintiff to put on the restraints could only have come from him before the video started but he does not recall when or where he gave the instruction to use physical force on the plaintiff to first restrain him. (<u>See</u> Exhibit B at 238-239:22-12.)

76. Officer Weidlein admits that he made the decision to use physical force on the Plaintiff before he or any ICE officer entered Plaintiff's cell and that the other ICE officers acted on his instructions. (<u>See</u> Exhibit B at 240:8-19.)

77. Officer Weidlein admits to using physical force on Plaintiff consistent with the use of force protocols on Detainees who are resisting. (See Exhibit B at 298:13-22.)

78. Officer Weidlein admits that Plaintiff while lying on the ground in restraints does not strike his head at all but remains passive and cooperative. (See Exhibit B at 251-252:5-10.)

79. Officer Weidlein admits that he had no record demonstrating that Plaintiff posed a violent risk to himself or anyone at any time. (See Exhibit B at 281-282:24-22.)

80. Officer Weidlein admits that he ordered the use of physical force on the Plaintiff to put the restraints on him for transportation. (See Exhibit B at 301-302:9-2.)

81. Officer Folajaiye stated that Officer Weidlein did not give any instructions to any officer while he was in the room. (See Exhibit C at 34:21-25.)

82. Officer Folajaiye stated that putting someone in a body wrap rarely happens at Varick Street Detention. (See Exhibit C at 37-38:15-11.)

83. Officer Folajaiye confirmed that Officer Weidlein made the decision to put Plaintiff in the body wrap before he entered the cell. (See Exhibit C at 38:17-21.)

84. Officer Folajaiye also has no memory of whether Plaintiff was seated or on the floor when he first saw him through the Cell door window. (See Exhibit C at 38-39:24-4.)

85. Like Officer Weidlein, Officer Folajaiye also has no recollection of the rare events of August 17, 2015 without recourse to the Video. (See Exhibit C 235-27:24-8.)

86. The ICE officers held Plaintiff down while they placed his wrists and ankles in cuffs and looped a chain through his wrist, ankles and waist/chest. (See Exhibit A at 136:15-21.)

87. Plaintiff lay cuffed and chained on the floor for approximately a minute or more (See Exhibit A at 136:22-25; Video Exhibit I at 0:35-2:42.)

88. After about a minute or so an ICE agent put a spitting hood over the plaintiff's head while he was on the floor and he remained on the floor in cuffs and chains, with the hood over his head for approximately a minute. (See Exhibit A at 136:24-25.)

89. After approximately another minute, Plaintiff was picked by the chains and felt a very sharp pain in his back, ankles and wrists. (See Exhibit A at 151-152:9-4.)

90. Officer Weidlein admits that in removing a restrained detainee from the floor who was restrained in the manner Plaintiff was, the ICE officers would have to pick him from under his body and not lift him from the belly chain. (See Exhibit B at 286:8-25.)

VI. Officers Weidlein and Folajaiye's Testimony Lacks Independent Recollection and Fails to Contradict Plaintiff's Account.

91. Officer Weidlein fails to recall any salient material facts about his first official physical contact with Plaintiff on the subject date; he fails to recall any verbal commands issued to him to comply with being re-restrained. (See Exhibit A at 279:10-13.)

92. Officer Weidlein fails to recall who was the first ICE officer to make any physical contact and or verbal contact with Plaintiff even though he was the senior most officer authorized to use physical force on the Plaintiff to re-restrain. (See Exhibit A at 238:8-25.)

93. Officer Weidlein fails to recall if the Plaintiff was seated or lying prone on the ground when he or any other ICE officer first encountered him to re-restrain him. (See Exhibit A at 177:21-25; Exhibit B at 178:2-4.)

94. Officer Weidlein fails to recall and or rebut Plaintiff's allegation that he was sitting alone in the cell room unrestrained. (See Exhibit B at 202:10-23.)

95. Officer Weidlein fails to recall who and how the ICE officers under his command re-entered the Plaintiff's Cell and what their first verbal and or physical contact was with the Plaintiff. (See Exhibit B at 206-207.)

96. Officer Weidlein fails to recall and or rebut Plaintiff's allegation that he was picked up by ICE officers while he was seated and slammed to the ground without any provocation on his part. (See Exhibit B at 178-179.)

97. Officer Weidlein fails to recall and or rebut the allegation that Plaintiff was kicked and punched after he was thrown to the ground from a seated position. (See Exhibit B at 260: 4-11; Exhibit B at 266:16-23.)

98. Officer Weidlein fails to recall and or rebut Plaintiff's testimony that neither he or any other ICE officer ever formally requested Plaintiff to stand from a seated position and comply with the protocol for detainee restraints as provided by the ICE use of force guidelines for non-compliant detainees. (See Exhibit B at 184-186.)

99. Officer Weidlein admitted that he would not have independently remembered this incident if he had not watched the video and admitted that he could only remember what the video showed, nothing before and nothing after. (See Exhibit B at 296-297:20-4.).

100. Officer Weidlein admits to being involved in only two incidents involving an OIG investigation for misconduct during his entire career with ICE. (See Exhibit B at 48:16-19.)

101. Officer Weidlein admits that the OIG investigations were very important to him because it involved allegations of misconduct against him. (See Exhibit B at 50:16-25.)

102. However, despite agreeing that he remembered other important events like birthdays and agreeing that these OIG investigations were very singularly important events which he would not hope to repeat, Officer Weidlein stated that he had no independent recollection of any of the OIG investigations. (See Exhibit B at 51-52:6-18.).

103. Officer Weidlein admitted that the OIG investigated the incident with Plaintiff and that Officer Weidlein does not recall any other incident comparable to the one involving Plaintiff during his time at Varick Street. (See Exhibit B at 53:9-25; Exhibit B at 67: 4-12.).

104.    Officer Weidlein admitted that he was anxious during the OIG investigation involving Plaintiff and was relieved that it was over because he was concerned that it might impact his job. (See Exhibit B at 56:1-17.)

105.    Officer Weidlein admits that he was the only person with authority at the time of the incident with Plaintiff who could have ordered the use of A humane Restraining on the Plaintiff. (See Exhibit B at 195:5-11.)

106.    The Humane Restraint Blanket is only used on detainees that are actively resisting being placed in cuffs and chains. (See Exhibit B at 201:21-24.).

107.    Officer Weidlein admits that Plaintiff is only passively resisting in the videos that refresh his recollection about the incident. (See Exhibit B at 204:24-25.)

108.    Officer Weidlein admits that he gave authority for the Humane Restraint Blanket  to be used before he entered the cell as he does not give any instructions about its use from when he first enters the Cell through the time he was in the Cell with the other ICE officers. (See Exhibit B at 199:3-5; Video Exhibit H at 0:00-0:18.)

VII. ICE Agents' Actions and Supervisory Failures Demonstrate Deficiencies in Their Training, Supervision, and Retention Practices.

109.    Dr. Roger Buck, an ICE physician who treated Plaintiff telephonically identified Plaintiff was diagnosed by ICE medical personnel with neuropathy after the contact with ICE agents at the Varick Street detention center. (See Exhibit L at 22:10-22.)

110.    It is undisputed that no verbal commands were issued to Plaintiff to comply with being re-restrained. (See Exhibit A 141:2-12.)

111.    Officer Weidlein fails to recall who was the first ICE officer to make any physical contact and or verbal contact with Plaintiff even though he was the senior most officer authorized to use physical force on the Plaintiff to re-restrain. (See Exhibit B 238:8-25.)

112.    Officer Weidlein fails to recall if the Plaintiff was seated or lying prone on the ground when he or any other ICE officer first encountered him to re-restrain him. (See Exhibit B at 177:2-4; Exhibit B at 178:8-19.)

113.    Officer Weidlein fails to recall and or rebut Plaintiff's allegation that he was sitting alone in the cell room unrestrained. (See Exhibit A 202:10-23.)

114.    Officer Weidlein fails to recall who and how the ICE officers under his command re-entered the Plaintiff's cell and what their first verbal and or physical contact was with the Plaintiff. (See Exhibit B at 206-07:7-3.)

115.    Officer Weidlein fails to recall and or rebut Plaintiff's allegation that he was picked up by ICE officers while he was seated and slammed to the ground without any provocation on his part. (See Exhibit B pg 178:2-19.)

116.    Officer Weidlein fails to recall and or rebut the allegation that Plaintiff was kicked and punched after he was thrown to the ground from a seated position. (See Exhibit B at 58:9-20; Exhibit B at 266:16-23.)

117.    Officer Weidlein fails to recall and or rebut Plaintiff's testimony that neither he or any other ICE officer ever formally requested Plaintiff to stand from a seated position and comply with the protocol for detainee re-restraints as provided by the ICE use of force guidelines for non-compliant detainees. (See Exhibit B at 184-85:20-25; Exhibit B at 58:9-20.)

118.    Officer Weidlein admitted that he would not have independently remembered this incident if he had not watched the video and admitted that he could only remember what the video showed, nothing before and nothing after. (See Exhibit A at 296-297:20-4.)

119.    Officer Weidlein admits to being involved in only two incidents involving an OIG investigation for misconduct during his entire career with ICE. (See Exhibit B at 48:16-19.)

120.    Officer Weidlein admits that the OIG investigations were very important to him because it involved allegations of misconduct against him. (See Exhibit B at 50:16-25.)

121.    However, despite agreeing that he remembered other important events like birthdays and agreeing that these OIG investigations were very singularly important events which he would not hope to repeat, Officer Weidlein stated that he had no independent recollection of any of the OIG investigations. (See Exhibit B at 51-52:6-18.)

122.    Officer Weidlein admitted that the OIG investigated the incident with Plaintiff and that he does not recall any other incident comparable to the one involving plaintiff during his time at Varick Street. (See Exhibit B at 53:9-25; Exhibit B at 67: 4-12.).

123.    Officer Weidlein admitted that he was anxious during the OIG investigation involving Plaintiff and was relieved that it was over because he was concerned that it might impact his job. (See Exhibit B at 56:1-17.)

124.    Officer Weidlein admits that he was the only person with authority at the time of the incident with Plaintiff who could have ordered the use of a Humane Restraint Blanket on the Plaintiff. (See Exhibit B at 195:5-11.)

125.    The Humane Restraint Blanket is only used on detainees that are actively resisting being placed in cuffs and chains. (See Exhibit B at 201:21-24.).

126.    Officer Weidlein admits that Plaintiff is only passively resisting in the videos that refresh his recollection about the incident. (See Exhibit B at 204:24-25.)

127.    Officer Weidlein admits that he gave authority for the Humane Restraint Blanket to be used before he entered the cell as he does not give any instructions about its use from when he first enters the Cell through the time he was in the Cell with the other ICE officers. (See Exhibit B at 199:3-5.)

128.    Officer Weidlein admits that if the ICE officers were kneeling on the floor then Plaintiff was also on the floor when they were attempting to restrain him. (See Exhibit B at 178:8-19.).

129.    Officer Weidlein admits that he did not receive any reports of Plaintiff resisting. (See Exhibit B at 190:4-7.).

130.    Officer Weidlein admits that ICE officers used a human restraint blanket on Plaintiff and that it was under his head at some point. (See Exhibit B at 250:3-5.).

131.    Officer Weidlein admits that ICE officers held Plaintiff's head before using the human restraint blanket. (See Exhibit B at 250:7-19.).

132.    Officer Weidlein admits that he placed a middle chain between Plaintiff's belly  and his leg shackles. (See Exhibit B at 259:12-19.).

133.    Officer Weidlein admits to putting a spit bag on Plaintiff. (See Exhibit B 283:8-12.).

134.    Officer Weidlein admits it would be improper for anyone to lift Plaintiff with the chains on. (See Exhibit B at 295:7-14.)

135.    Officer Weidlein admits that ICE officers used force to restrain Plaintiff and apply the restraints. (See Exhibit B at 298-99:23-8.)

136.    Officer Weidlein admits that ICE officers made contact with Plaintiff and moved him when they were attempting to restrain him. (See Exhibit B at 176: 16-20).

137.    Officer Folajaiye admits that they had physical contact with the Plaintiff based on the video. (See Exhibit A at 39:13-16.).

138.    Officer Folajaiye admits that he was holding Plaintiff's head as ICE officers were attempting to restrain him. (See Exhibit A at 39:22-24.).

139.    Officer Folajaiye admits that it was him who was holding Plaintiff's head in the video (See Exhibit 1 at 1:45; Exhibit 2 at 0:19-0:33; Exhibit A at 59:22-23; Exhibit A at 60:2.)

140. Officer Folajaiye admits that ICE officers placed Plaintiff's entire body in a wrap (See Exhibit A at 45:2-4.)

141. Officer Folajaiye admits that it is inappropriate for Plaintiff to be picked up off the floor by being pulled on his chain that is connected from his ankles to his wrists (See Exhibit A at 66:13-18.)

142. ICE officers picked Plaintiff up by the sides and slammed him down to the ground; Plaintiff's lower leg up to his back was slammed into the floor (See Exhibit A at 142:11-14.)

143. Plaintiff experienced sharp pain on level 10 from a scale of 1 to 10 from his lower back after ICE officers slammed him into the ground. (See Exhibit A at 143:3-21.)

144. Plaintiff was screaming "please don't kill me" as ICE officers slammed him into the ground and were trying to restrain him. (See Exhibit A at 143:22-25.)

145. Plaintiff was crying and the ICE officers put a hood over his head and he could not see anybody. (See Exhibit A at 146:2-4.)

146. Plaintiff had his back on the floor when ICE officers placed handcuffs on his wrists and a chain that connected both of his wrists and a chain on his waist. (See Exhibit A at 147:2-25.)

147. ICE officers were kicking and punching Plaintiff after they slammed him into the floor. (See Exhibit A at 135:9-16.)

148. Plaintiff had a hood over his head when ICE officers picked him up from the floor where he felt a sharp pain in his ankles and wrists and felt as if he was hanging in the air. (See Exhibit A at 151:13-20.)

149. Plaintiff felt someone pushing his chest and calling his name when he was at the airport. (See Exhibit A at 154:2-14.)

150. Plaintiff's hands and feet were extremely numb and swollen when he was at the airport due to his injuries from ICE officers. (See Exhibit A at 158:3-9.)

VIII. Defendant's Mishandling of Plaintiff's Detention Directly and Foreseeably Resulted in His PTSD and Related Disabilities.

151.    Prior to Plaintiff's detention and encounter with ICE on August 17, 2015, Plaintiff had no known documented history of trauma when he was in Defendant's custody through the Bureau of Prisons clinical reports as reported from his initial clinical encounters on September 11, 2008, November 3, 2008, and December 8, 2008. (See Ex Z BOP health records at page 1-5.)

152.    Throughout Plaintiff's incarceration with BOP and prior to his detention and encounter with ICE on August 17, 2015, Plaintiff still had no documented reports of any trauma or mental illness reported from his clinical encounters with BOP on July 28, 2009, September 22, 2009, October 8-9, 2009, November 13, 2009, November 23, 2009, December 22, 2009, September 14, 2012, September 21, 2012 and September 24, 2012. (See Exhibit Z at pages 6-15.)

153.    On August 19, 2025, 2 days after Plaintiff's traumatic incident with ICE, Plaintiff reported that he could not walk due to injuries sustained while being cuffed in New York, and Dr. Buck recommended Plaintiff be transferred to Riverview Regional Medical Center for evaluation, with reports of multiple abrasions on chins and left wrist, and below the knees. Plaintiff was reported to be unable to stand on his own at the time of the injury and was in a wheelchair. (See Ex P pages 1-3.)

154.    On August 19, 2025, 2 days after Plaintiff's traumatic incident with ICE, Plaintiff had special needs requirements for a wheelchair. (See Ex P at page 3 and 14.)

155.    On November 25, 2015, Dr. Roger Buck reported that Plaintiff complains of numbness in his hands and feet as well as weakness in his legs and being unable to walk without crutches

due to handcuffs and ankle cuffs being applied too tightly to his hands and arms. (See Ex Y

at 1).

156.    On December 27, 2015, Plaintiff was prescribed an increased dosage of Gabapentin for

600 MG by Defendants after he submitted an inmate medical request form on December 21,

2015 due to the numbness and pain in his feet and hands as a result of his contact with ICE

when detained on August 17, 2015. (See Ex P page 4; Ex W at 7).

157.    There was a request to ICE for an outside consult for Plaintiff for a neurology evaluation

with circumstances involving the inability to walk and recurrent weakness. (See Ex L at

60:6-24).

158.    When Plaintiff arrived, Dr. Roger Buck was called and they could not get Plaintiff  off

the bus because he was unable to walk. (See Ex L at 61:7-11).

159.    ICE approved the request to have Plaintiff treated at Riverview Regional Medical Center,

which Dr. Roger Buck said it was his initial trip to the hospital prior to the neurological

consult request. (See Ex L at 61-62:12-3).

160.    ICE approved the request for the outside neurology consult for Plaintiff. (See Ex L at

62:4-7).

161.    Plaintiff was diagnosed with PTSD and Dysthymic Disorder on December 5, 2016. (See

Exhibit E at 1.)

162.    Doctors Roger Buck and Zwirn, employed by Defendant(s), do not deny that Plaintiff

experienced the symptoms he had reported, and despite mentioning that there was possibility

of "malingering" or exaggeration of his symptoms, they still did not deny the existence of his

symptoms as a result of his traumatic incident with ICE. (See Ex Y at 7; Q at 14-15.)

163.    Dr. Zwirn, employed by Defendant(s), does not deny Plaintiff's diagnosis of PTSD by Dr. Lucas and reports it is possible that Plaintiff suffered from PTSD symptoms. (See Ex Q at 14 and 15).

164.    Dr. Rosenfeld, employed by Defendant(s), opined as follows: it should also be noted that the possible presence of deliberate symptom exaggeration by Plaintiff does not preclude the presence of genuine symptoms, or the experience of such symptoms in the past. (See Ex R at 4).

165.    Dr. Zwirn reported that the events of August 17, 2015, as reported by Mr. Nkansah, would rise to the level of a possible cause of PTSD and the symptoms that Mr. Nkansah has described, if accurately reported, would support a diagnosis of PTSD. (See Ex Q at page 15).

166.    Carlos J. Figarola, M.D. confirms that Plaintiff is suffering from Post Traumatic Stress Disorder, chronic, as a direct result from his experience while being detained by ICE. (See Ex D at 1).

167.    Plaintiff's final cumulative Medicaid PTSD medical expenditures from his initial diagnosis in 2016 until 2025 in Corning, NY is approximately ≈ $96,318. (See Exhibit F at 4.)

168.    The psychiatric report by Carlos J. Figarola, M.D. confirms that Plaintiff suffers from PTSD as a direct result of his experiences during his incarceration from December 2014 to March 2016 by ICE. (See Exhibit D at 2.)

169.    The psychiatric report by Carlos J. Figarola, M.D. confirms that Plaintiff's incarceration, threat to his safety and subsequent physical contact that occurred on August 17, 2025 by ICE constitute a severe traumatic event. (See Exhibit D at 2.)

170.    The psychiatric report by Carlos J. Figarola, M.D. confirms that Plaintiff's symptoms of PTSD are well documented, specifically, the summary of services report from the Steuben

County Community Mental Health Center and that his PTSD is not disputed in reports submitted by the United States Attorney's office. (See Exhibit D at 2.)

171.    The psychiatric report by Carlos J. Figarola, M.D. confirms that Plaintiff's PTSD is present and not exaggerated. (See Exhibit D at 3.)

172.    The psychiatric report by Carlos J. Figarola, M.D. confirms that psychological testing was done on Plaintiff to clarify he has PTSD and that he is not exaggerating his reported symptoms, and testing showed he was being truthful. (See Exhibit D at 3.)

173.    The psychiatric report by Carlos J. Figarola, M.D. confirms that upon his release in March 2016, Plaintiff was walking with the help of crutches and could not go up the stairs to his bedroom and his PTSD was very active. (See Exhibit D at 2.)

174.    Plaintiff was having trouble sleeping, was irritable, disorganized, and has trouble functioning. (See Exhibit D at 2.)

175.    Plaintiff has a well-documented sleep disorder and that his sleep disturbances include specific clear elements that validate his PTSD. (See Exhibit D at 6.)

176.    The psychiatric report by Carlos J. Figarola, M.D. confirms that Plaintiff's record reflects clear documentation of re-experiencing and troubling nightmares directly related to his wrongful incarceration and traumatic experience with ICE, including the traumatic experience of August 17, 2015 as well as his entire experience while detained. (See Exhibit D at 6.)

177.    The psychiatric report by Carlos J. Figarola, M.D. confirms that Plaintiff's functioning is not good, contrasting with Dr. Zwirn's report, because there is clear documentation of a severe decline in Plaintiff's psychosocial functioning. (See Exhibit D at 6.)

178.    The psychiatric report by Carlos J. Figarola, M.D. confirms that because of Plaintiff's PTSD, with his heightened sensitivity to noise, increased irritability and moodiness, as well

as needing to be alone at times, Plaintiff has been unable to develop an ongoing healthy relationship. (See Exhibit D at 6.)

179.   There is a report pertaining to the medical examination of Plaintiff at the Louisiana airport on August 17, 2015 in which he was not responsive.  (See Exhibit D at 7.)

180.   A note dated August 17, 2015 documents Plaintiff's complaint of being assaulted and in pain, with his pain at a rating of 10 out of 10. (See Exhibit D at 7.)

181.   A note by Dr. Zwirn dated August 19, 2015 stated that Plaintiff could not walk. (See Exhibit D at 7.)

182.   A note dated on August 19, 2015 documents Plaintiff's complaints of numbness in both feet, confirming swelling, bruising, and abrasions. (See Exhibit D at 7.)

183.   Plaintiff is currently unable to work and is unable to return to school. (See Exhibit D at 2.)

184.   Plaintiff is an ill man due to his encounter with ICE on August 17, 2015.. (See Exhibit D at 2.)

185.   Plaintiff remains ill and disabled and continues to have serious mental health problems, requiring continued treatment as a result of his experience while in captivity by Defendants from December 17, 2014 to March 2016. (See Exhibit D at 8.)

186.   Plaintiff developed symptoms while incarcerated by Defendants. (See Exhibit D at 8.)

187.   Plaintiff has had multiple physical complaints, developed sleep disturbances, and was eventually treated with Citalopram (an antidepressant.), Quetipane (a sedating antipsychotic often used for insomnia.), and Gabapentin (a medication for pain.). (See Exhibit D at 8.)

188.   Plaintiff continues to experience and complain of leg pain often after his incident with ICE, wears compression socks for the pain, has poor circulation in his legs, and has a continued lack of sleep which leads to his physical disadvantages. (See Ex S at 33:21-25.)

189.    Plaintiff's ongoing leg pain, poor circulation and lack of sleep, as well as rarely leaving

the house when it is cold because of his worsening leg pain has been witnessed by the mother

of his child. (See Ex S at 56:11-14.)

190.    The mother of Plaintiff's child is aware of his battle with PTSD and continues to take

him to his mental health appointments. (See Ex S at 31:10-20.)


## IX. Undisputed Video Evidence Corroborates Plaintiff's Account of the Incident.

191.    On or about October 22, 2020, the United States Government, through its counsel,

produced video recordings depicting the events at the issue of this case, *Nkansah v. United*

*States*, in response to Plaintiff's discovery requests.

192.    The video was produced in response to discovery requests made by the defense and

marked as Government Exhibit G, H, I, J, K.

193.    The Government has not disputed the authenticity of the video and has represented it as a

true and accurate recording of the relevant incident(s) involving the defendant.

194.    The video has been reviewed and authenticated by Officer Weidlein and Officer

Folajaiye, as well as in the OIG investigation conducted on September 21, 2015. Both

officers under oath confirmed that the video accurately depicts the scene and individuals

involved.

195.    The authenticity of the video has not been meaningfully challenged by the Government

or any party, and it has been relied upon in prior proceedings, including the OIG

investigation on September 21, 2015.

196.    The production and authentication of the video are not in dispute and support the

Plaintiff's position regarding the underlying factual record.


Dated: New York, New York
          July 18, 2025

                                        Rehan Nazrali
                                        *Attorney for Plaintiff*
                                        277 Broadway
                                        New York, NY, 10007


                                    By: _____/S/_____

                                        Rehan Nazrali Esq